**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-6151**

———————

THOMAS D. ALEXANDER,

        Plaintiff – Appellant,

v.

SERGEANT CONNOR; GREGORY WILKINS,

        Defendants – Appellees.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever, III, District Judge. (5:20-ct-03076-D)

———————

Argued: May 9, 2024                                       Decided: June 24, 2024

———————

Before WYNN, HARRIS, and HEYTENS, Circuit Judges.

———————

Vacated and remanded by published opinion. Judge Heytens wrote the opinion, which Judge Wynn and Judge Harris joined.

———————

**ARGUED:** Kinsey Novak Booth, WEST VIRGINIA UNIVERSITY COLLEGE OF LAW, Morgantown, West Virginia, for Appellant. Alex Ryan Williams, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Lawrence D. Rosenberg, JONES DAY, Washington, D.C., for Appellant. Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

———————

TOBY HEYTENS, Circuit Judge:

An incarcerated person claims two correctional officers violated the Fourth and Eighth Amendments by violently pulling a contraband phone out of his rectum in a prison shower. The officers, in contrast, insist they found the phone in the plaintiff's pocket and used no more force than warranted under the circumstances. The district court granted summary judgment for the officers, relying on a video that captured some of what happened. But that video does not resolve even the basic question of where the phone was located. We therefore vacate and remand for further proceedings.

I.

In 2020, plaintiff Thomas Alexander was incarcerated at Eastern Correctional Institution in North Carolina. Defendant Brandon Connor, a correctional officer who then held the rank of sergeant, got a tip that Alexander had an unauthorized cellphone. Connor ordered Gregory Wilkins, another correctional officer, to "pull [Alexander] from his cell to be strip searched in an attempt to locate the contraband cell phone." JA 162.

Connor used a handheld metal detector to scan the outside of Alexander's clothes, but the parties disagree about whether the detector alerted. The officers say it did. Alexander insists it did not. But no one disputes that—after the external scan—Connor and Wilkins brought Alexander to a shower room for a more thorough search.

Once the three arrived at the shower room, Connor ordered Alexander to submit to a strip search. What happened next is disputed. In Alexander's version of events, he refused but agreed to a "pat . . . down" or "frisk." JA 207. Connor then responded "we can do this the easy way or the hard way." *Id.* Alexander claims he asked for a more senior officer to

2

be called to the shower, but that request was ignored. All agree that, after some back and forth, Connor pepper sprayed Alexander in the face.

From there, the parties' accounts diverge even more. Alexander says the officers "slammed" him to the ground, forced him on to his stomach, and handcuffed him. JA 174. Connor then "grab[bed] a fist full of [Alexander's] hair and start[ed] yanking [his] head back and forth," yelling "where is the fucking phone." JA 207. As Alexander screamed "as loud as [he] could" for help, the officers pulled down three layers of clothing (outer pants, a pair of shorts worn under the pants, and underwear) before Alexander felt "a person's hand slide in between [his] buttocks [and] fingers enter into [his] rectum and pull out [a] cell phone." JA 207–08. After the phone was recovered, Alexander says Connor grabbed his right hand and "jerk[ed] it violently . . . against the metal cuffs," spraining his wrist. JA 208. The officers brought Alexander to his feet and held him under a shower head, clearing some (but not all) of the pepper spray from his face. Alexander was escorted back to his cell, where he sat for an hour "in soaking wet clothes and shoeless" before being taken to a hospital to have the rest of the pepper spray flushed from his face and his wrist x-rayed. *Id*. [1]

Not surprisingly, the officers offer a different account. They claim that Alexander was pepper sprayed because he started swinging his arms in a threatening manner, and that

---

[1] The officers fault Alexander for not specifically asserting in his complaint that Connor pulled his hair or when precisely during the encounter Connor yanked his wrist. But pro se complaints like Alexander's must be liberally—not grudgingly—construed, see, *e.g.*, *Pendleton v. Jividen*, 96 F.4th 652, 656 (4th Cir. 2024), and we conclude Alexander's arguments on appeal are fairly encompassed within his complaint.

3

he responded to the officers' warning that they would spray him by saying "do what you do." JA 69. The officers also assert that they removed only one layer of clothing (Alexander's outer pants) before finding the phone inside a makeshift pocket sewn into the shorts Alexander was wearing between his pants and his underwear. The officers insist that they never grabbed Alexander's hair, jerked his head around, or yanked his wrists against the handcuffs.

Alexander filed a pro se lawsuit against the officers under 42 U.S.C. § 1983, asserting violations of the Fourth and Eighth Amendments. The officers moved for summary judgment, presenting affidavits, incident and medical reports, and a video showing a portion of the incident. Alexander filed several handwritten documents (including a declaration) that gave a sharply different account of the facts than the officers did.

The district court granted the officers' summary judgment motion, concluding no reasonable jury could find they violated the Fourth or Eighth Amendments. Alexander filed a pro se notice of appeal and an informal opening brief. After a preliminary review, this Court appointed pro bono counsel to represent Alexander. "We review a grant of summary judgment de novo, applying the same legal standards as the district court[.]" *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 276 (4th Cir. 2024).

## II.

"The first step in assessing the constitutionality of [an officer's] actions is to determine the relevant facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). This case presents a recurring question: what should courts do where (as here) the parties disagree about what

4

happened?

The answer, of course, turns on a case's procedural posture. When a defendant moves to dismiss a plaintiff's complaint for failure to state a claim on which relief can be granted, the court must—no matter how vehemently the defendant disagrees—decide that motion on the assumption that all the complaint's "well-pleaded factual allegations" are true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In contrast, once a case reaches trial the factfinder—whether a jury or the judge—considers all the evidence before it, resolves any conflicts, and decides who and what to believe.

Summary judgment lies between these poles, but the principles that control here are closer to those governing a motion to dismiss than a trial on the merits. True, non-moving parties who would bear the burden of proof on an issue at trial (like Alexander) may not simply rest on assertions in their complaint but must produce evidence that could—if believed—permit a reasonable factfinder to rule in their favor. See, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986). But once that party produces such evidence, the court must decide a summary judgment motion on the assumption that the factfinder would believe that evidence and credit it over any contrary evidence offered by the moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Take the parties' dispute about whether the handheld metal detector went off when the officers ran it across Alexander's body. The officers submitted affidavits claiming it alerted, and their brief argues that *must* be right because the cellphone that was ultimately found contained metal (which would have triggered the metal detector). But Alexander was there too, and he submitted his own declaration saying the metal detector never went off

5

and that the phone contained no metal components. Yes, that assertion is far from ironclad, and a reasonable factfinder might decline to believe it. But making "[c]redibility determinations" is strictly forbidden at this stage, *Anderson*, 477 U.S. at 255, and this Court has made clear that—so long as they are "based on personal knowledge or firsthand experience"—"self-serving affidavits offered by the non-movant can be used as evidence to defeat summary judgment." *Jones v. Solomon*, 90 F.4th 198, 206–07 (4th Cir. 2024) (brackets and quotation marks removed). For that reason, the district court had to assume— for purposes of the current motion—that the metal detector never alerted.

The same goes for the officers' assertions that "the record as a whole" refutes Alexander's claim "that a manual body cavity search . . . occurred." Officers Br. 11. The officers insist that the video's timeline "does not support the conclusion that" they did a cavity search, that "it does not make sense" that they would have done one without fully removing Alexander's shorts, and that the video shows Connor touching his pants after the search, which "he would not have done if his fingers had just been inside [Alexander's] rectum." *Id.* at 11–12. The officers also say that photographs and medical records they submitted "support[ ]" their "contentions" about what happened and tend to undermine Alexander's. *Id.* at 13.

Those arguments might well persuade a factfinder, but they profoundly misunderstand the role of the court at the summary judgment stage. At this point, the sort of things the officers are asking us to do—weigh evidence and draw inferences from the facts—have no place. See *Anderson*, 477 U.S. at 255. Our job is not to determine what really happened or figure out whose version of events is more likely to be true or lines up

6

better with the known facts. Instead, we must "view the evidence . . . in the light most favorable to" Alexander and assume the factfinder would resolve all genuinely "disputed issues" in his favor and against the officers. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

Unlike the officers' arguments about the "record as a whole" (Officers Br. 11), the district court lasered in on the videotape. Citing the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007), the court concluded that "[t]he video so utterly discredits" the "version of events" set out in Alexander's declaration "that no reasonable jury could have believed him." JA 282 (brackets and quotation marks removed). We conclude that was legal error.

This Court has repeatedly cautioned against misuse of *Scott*'s "narrow exception" to the general rule that a court must adopt "the plaintiff's version of the facts" when considering a summary judgment motion. *Lewis v. Caraballo*, 98 F.4th 521, 529 (4th Cir. 2024) (first quote); *Scott*, 550 U.S. at 378 (second quote).[2] A court may not disregard contrary evidence just because there is a video that lines up with "a governmental officer's version of events" or "even makes it unlikely that the plaintiff's account is true." *Witt v. West Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (first quote); *Harris v. Pittman*, 927 F.3d 266, 276 (4th Cir. 2019) (quotation marks removed) (second quote).

---

[2] Along with *Lewis,* see *Jones*, 90 F.4th at 204; *Harris v. Pittman*, 927 F.3d 266, 276 (4th Cir. 2019); *Witt v. West Va. State Police, Troop 2*, 633 F.3d 272, 276–77 (4th Cir. 2011); *Greene v. Feaster*, 775 Fed. Appx. 90, 91 (4th Cir. 2019) (per curiam) (vacating decision that relied on *Scott* in resolving a summary judgment motion); *Poindexter v. Sandy*, No. 21-6638, 2022 WL 1656126, at *3 (4th Cir. May 25, 2022) (per curiam) (same); *Fraley v. Davis*, No. 21-6641, 2022 WL 3210702, at *2 (4th Cir. Aug. 9, 2022) (per curiam) (same).

Instead, a court considering a defendant's summary judgment motion may discount a plaintiff's first-hand account "*only* [1] when there is evidence . . . of undisputed authenticity that [2] shows some material element of the plaintiff's account to be *blatantly and demonstrably* false" [3] such "that no reasonable jury could" credit the plaintiff's version of events. *Harris*, 927 F.3d at 276 (emphases added and quotation marks removed) (first quote); *Scott*, 550 U.S. at 380 (second quote).

The video here comes nowhere close to meeting that high standard. The soundless ten-minute recording shows the officers leading Alexander from the cellblock into the shower room. From that point on, Alexander is largely out of view until he is brought back out of the shower room and the officers are either not shown or seen almost entirely from behind. The officers appear to have a short conversation with Alexander before one of them brings Alexander to the floor. One or both officers' bodies are between the camera and Alexander's body from then on, and a third officer (who is not a defendant here) later arrives and begins further blocking the camera's view while the incident is still ongoing. The officers then appear to lift Alexander to his feet, and Alexander disappears from the video again for more than four minutes. The video ends with all three officers leading Alexander out through a different door than the one through which he entered.

Although the parties invite us to read things into a flash of Alexander's hair or the movement of an officer's body, we conclude that the video does not "clearly" depict much of anything about what happened in the shower room. *Scott*, 550 U.S. at 378. At no point do we see how many layers of Alexander's clothing are removed. The video does not allow us to determine whether an officer grabbed Alexander's hair or yanked on his wrist;

8

whether there was a white pocket sewn onto Alexander's shorts; or the location from which the phone was recovered. We see no inherent contradiction between the video and Alexander's account—blatant or otherwise. For that reason, the district court needed to credit Alexander's version of events when resolving the officers' summary judgment motion.

### III.

With the facts properly framed, we arrive at the merits questions on which the district court's ruling turned: Could a reasonable jury find facts that would establish a violation of Alexander's Fourth or Eighth Amendment rights? Concluding the answer is yes as to both, we vacate the district court's judgment and remand for further proceedings.

### A.

The Fourth Amendment forbids "unreasonable searches and seizures." U.S. Const. amend. IV. No doubt, the prison setting matters a great deal, and the Fourth Amendment permits prison officials to conduct plenty of searches and seizures that would be constitutionally unreasonable if performed outside a prison. See, *e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 557 (1979) (dismissing any suggestion that prison officials need a warrant to search a prisoner's cell). Yet "prisons are not beyond the reach of the Constitution," *Hudson v. Palmer*, 468 U.S. 517, 523 (1984), and this Court has held that the Fourth Amendment continues to guarantee prisoners "some legitimate expectation of privacy in [their] person," *King v. Rubenstein*, 825 F.3d 206, 215 (4th Cir. 2016). In deciding whether an in-prison search violates the Fourth Amendment, we consider: (1) "the scope of the particular intrusion"; (2) "the manner in which it is conducted; (3) "the justification for

9

initiating it"; and (4) "the place in which it is conducted." *Id.* at 214–15 (quotation marks removed). Applying those standards, we conclude that resolving all factual disputes and drawing all reasonable inferences in Alexander's favor would establish a Fourth Amendment violation here.

To be sure, the third factor—the asserted justification for the search—favors the officers. The presence of contraband in prisons is "one of the most perplexing problems of prisons today" and prison officials always "must be . . . alert to" it. *Hudson*, 468 U.S. at 527. Although we must accept Alexander's claim that the handheld metal detector never went off, both the anonymous tip and Alexander's undisputed history of possessing contraband in prison supported the officers' decision to search him.

But that does not end the inquiry. Even when the Constitution permits a search, courts must ensure it was carried out in a constitutionally reasonable manner. This is particularly so of the sort of "sexually invasive" search that we must assume took place here. *United States v. Edwards*, 666 F.3d 877, 883 (4th Cir. 2011). And taking the facts in the light most favorable to Alexander, we conclude that the other three factors identified in our cases—the scope, manner, and location of the search—cut in Alexander's favor.

For starters, no matter how you look at it, the sort of manual examination of Alexander's rectum described in his declaration constitutes a grave and "objectively extreme" intrusion. *King*, 825 F.3d at 216. The Supreme Court has cautioned against "underestimat[ing] the degree to which" even a *visual* body cavity search—one where prisoners "are required to expose their body cavities for visual inspection"—"invade[s] the personal privacy of inmates." *Bell*, 441 U.S. at 558, 560. What Alexander alleges (and what

10

we must assume true) goes far beyond that. Alexander's declaration describes what courts have termed a "manual body cavity search," an action that "constitut[es] a drastic and total intrusion of the personal privacy and security values shielded by the [F]ourth [A]mendment" and "threaten[s] the highest degree of dignity that we are entrusted to protect." *Leverette v. Bell*, 247 F.3d 160, 165 n.1 (4th Cir. 2001) (quotation marks removed) (first quote); *Rodriques v. Furtado*, 950 F.2d 805, 811 (1st Cir. 1991) (second and third quotes).

The context, manner, and location of the intrusion only compound the Fourth Amendment concerns. This search was neither conducted by a medical professional, nor in a medical setting. See *Rodriques*, 950 F.2d at 811 (stating that, absent exigent circumstances, manual body cavity searches should be "conducted by a doctor in a private and hygienic setting and in a medically approved manner"). Instead, it was performed by two correctional officers on the floor of a shower room whose door was open to a public corridor through which others could—and did—pass by during the encounter. See *Edwards*, 666 F.3d at 883 (instructing us to "consider whether a sexually invasive search could have been viewed by others, and whether it was in fact viewed by others, in" analyzing "the reasonableness of the search").

Alexander also asserts that the officers quickly—and unnecessarily—escalated the nature of the encounter with little provocation from him by pepper spraying him, slamming him to the ground, grabbing him by his hair, and screaming expletives in his face before forcibly searching his rectum on the floor of a prison shower. We acknowledge, once again, that a factfinder might not believe Alexander, may credit the officers' version of events, or

11

find that the truth lies somewhere in between. But searches conducted "in an abusive fashion . . . cannot be condoned" even inside a prison, *Bell*, 441 U.S. at 560, and Alexander has created a genuine dispute of material fact about whether that is what happened here. And because this Court does not even require sexually invasive searches to rise to the level of abuse before they are deemed unreasonable, a reasonable jury could conclude this search violated Alexander's Fourth Amendment rights. See *Edwards*, 666 F.3d at 884–85 (holding that a sexually invasive search may be unreasonable if it is conducted in a manner that would instill fear, trauma, or risk of harm in the suspect); see also *Sims v. Labowitz*, 885 F.3d 254, 261–62 (4th Cir. 2018) (holding that the "intimidating manner" in which a sexually invasive search occurred weighed strongly against reasonableness).

B.

Although the matter is closer, we reach the same conclusion about Alexander's Eighth Amendment claim. The prohibition against "cruel and unusual punishments," U.S. Const. amend. VIII, includes "the use of excessive physical force against a prisoner." *Hudson v. McMillian*, 503 U.S. 1, 4 (1992). A prisoner bringing an Eighth Amendment excessive force claim must make two showings—one objective, the other subjective. "The objective component asks whether the force applied was sufficiently serious to establish a cause of action." *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). "[T]he subjective component . . . asks whether the officers" against whom the claim is brought "acted with a sufficiently culpable state of mind." *Id.* (quotation marks removed).

Alexander has done more than enough to avoid summary judgment on the objective component. This portion of the Eighth Amendment analysis focuses "on the nature of the

12

force" used "rather than the extent of" any injuries suffered by the plaintiff and requires only a "nontrivial" use of force. *Wilkins v. Gaddy*, 559 U.S. 34, 34, 39 (2010) (per curiam). Alexander's account of the events in the shower room—which we must assume to be true at this stage—easily clears that low bar. See *Brooks*, 924 F.3d at 112 (describing "[t]he objective component" as "not a high bar").

We also conclude that the record as a whole—construed in the light most favorable to Alexander—would permit a reasonable jury to conclude that Alexander has satisfied the subjective component. See *Brooks*, 924 F.3d at 107 (framing the summary judgment inquiry for the subjective component around what "a reasonable jury could find"). That component turns on an officer's motive for using the force they did—specifically, "whether [the] force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) (quotation marks removed). "The question is not whether a reasonable officer *could* have used force to maintain discipline, but whether these particular officers *did* use force for that reason." *Brooks*, 924 F.3d at 113.

The problem, of course, is that "direct evidence of motive or intent may be hard to come by." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021). For that reason, courts use yet another (and non-exhaustive) four-factor test to determine whether "a reasonable jury" could find the subjective component satisfied in a particular situation. *Id.* Those factors include: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the

13

severity of a forceful response." *Id.* (quotation marks removed). This Court has emphasized that, as with the underlying facts, "the proper inferences to be drawn from these factors" are "matter[s] for the jury." *Brooks*, 924 F.3d at 116.

Although the subjective component for Eighth Amendment excessive force claims imposes "a demanding standard," we conclude that a jury that resolved all factual disputes and drew all reasonable inferences in Alexander's favor would not exceed the bounds of its authority in finding that standard satisfied here. *Brooks*, 924 F.3d at 112. To begin, a jury that credited Alexander's account could find that there was *never* any "reasonably perceived threat" to the officers. *Dean*, 984 F.3d at 302 (quotation marks removed). Of course, correctional officials must sometimes use force for other reasons, and "we owe officers wide-deference in their determinations that force is required to induce compliance with policies important to institutional security." *Brooks*, 924 F.3d at 113 (quotation marks removed). But a jury that believed Alexander's version of events could reasonably conclude that there was little need for any force to determine whether he had a prohibited cellphone and that the types and amount of force the officers used in the shower went far beyond any legitimate justification. A jury that believed Alexander could further conclude that even though Alexander tried to deescalate the situation, the officers escalated it several times throughout the encounter. And a jury that reached those conclusions *could* infer that the reason the officers acted as they did was not to force Alexander to submit to a search for contraband but "to punish him for his" perceived "intransigence." *Id.* at 107. For that reason, we conclude that the district court erred in concluding that "no reasonable jury

14

could find" that the officers violated the Eighth Amendment. JA 283.[3]

## IV.

Before the district court, the officers also sought summary judgment on a different ground: that, even assuming they violated Alexander's constitutional rights, they are still entitled to qualified immunity because their actions did not violate any clearly established rights of which a reasonable officer would have been aware. The district court did not reach that issue, and the officers do not ask us to affirm on that alternative ground. Although we would have the power to decide the qualified immunity question in the first instance ourselves, see, *e.g.*, *Aleman v. City of Charlotte*, 80 F.4th 264, 295 (4th Cir. 2023), we decline to do so because neither party has asked us to and the officers chose not to brief the relevant issues. We thus vacate the district court's decision granting the officers' summary judgment motion and remand for further proceedings.

\*　　\*　　\*

We reaffirm that a plaintiff's own affidavit based on personal knowledge must be credited for purposes of adjudicating a summary judgment motion—even affidavits that are uncorroborated, self-serving, or filed by pro se prisoners. We also reiterate that *Scott v. Harris*'s narrow exception to the normal rules governing summary judgment is just that—narrow. The judgment is vacated, and the case is remanded for further proceedings

---

[3] In a two-sentence footnote devoid of citations, the officers' brief asserts that Wilkins cannot be held liable for violating the Eighth Amendment because "all alleged acts of excessive force were . . . completed by Sergeant Connor." Officers Br. 19 n.3. But the district court did not rely on any Wilkins-specific defense, and that sort of "passing shot" at an alternative ground for a partial affirmance is not enough to tee up an issue for our review. *Short v. Hartman*, 87 F.4th 593, 615 (4th Cir. 2023) (quotation marks removed).

consistent with this opinion.

*SO ORDERED*

16