**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-6380**

_____

JASON WAYNE GOWEN,

> Plaintiff - Appellant,

v.

LIEUTENANT WINFIELD, #23; SERGEANT P.R. FOUCHE, #40; CORPORAL TAYLOR, #88; OFFICER D.M. SCHNEBLAGGER,

> Defendants - Appellees.

and

MAJOR ENOCHS, #9

> Defendant.

_____

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Thomas T. Cullen, District Judge.  (7:20-cv-00247-TTC-JCH)

_____

Argued:  October 31, 2024                    Decided:  March 4, 2025

_____

Before NIEMEYER, BENJAMIN and BERNER, Circuit Judges.

_____

Reversed in part, vacated in part, and remanded by published opinion.  Judge Berner wrote the opinion, in which Judge Niemeyer and Judge Benjamin joined.

_____

**ARGUED:** Robert Louis Jones, IV, SULLIVAN & CROMWELL LLP, New York, New York, for Appellant. Christopher Stanislaw Dadak, GUYNN WADDELL, P.C., Salem, Virginia, for Appellees. **ON BRIEF:** Daniel R. Sweeney, Jason M. Winston, SULLIVAN & CROMWELL LLP, New York, New York, for Appellant. John R. Fitzgerald, GUYNN WADDELL, P.C., Salem, Virginia, for Appellees.

———————

BERNER, Circuit Judge:

Jason Wayne Gowen was held in pretrial detention at the Lynchburg Adult Detention Center in Lynchburg, Virginia. Our Constitution protects the right of pretrial detainees like Gowen to be free from punishment without due process of law. Yet only hours after he complained about unusually hot conditions in his cell and encouraged other inmates to do the same, Gowen was removed from the general population and placed in solitary confinement. There he remained for 125 days.

Gowen brought suit against the correctional officers whose actions led to his solitary confinement. He alleges they violated his First Amendment rights by retaliating against him for raising a grievance about the conditions in the cells and encouraging other inmates to do the same. He also alleges that the officers violated his rights under the Fourteenth Amendment by failing to provide him due process of law in placing him in solitary confinement. The district court dismissed Gowen's First Amendment retaliation claim and later granted summary judgment to the correctional officers on the Fourteenth Amendment due process claim. We reverse dismissal of Gowen's First Amendment retaliation claim and vacate the district court's grant of summary judgment.

## I.      Background

While awaiting trial on criminal charges, Gowen was detained in a lockdown facility known as K-Unit at the Lynchburg Adult Detention Center (LADC). K-Unit was made up of 48 cells, each of which had solid doors with a small slot that could be opened to allow a food tray to pass through. On September 26, 2018, the cells became abnormally hot and

3

humid after the air-conditioning system stopped working. Before returning to their cells for the day, a process known as "lockdown," a group of about 20 inmates requested that the food tray slots in their cells be kept open to allow for some air circulation. The correctional officer assigned to K-Unit at the time was not authorized to grant such a request and called for assistance from a supervisor. From there, the parties' accounts of what transpired differ.

### A.     Gowen's Version of Events

The following is Gowen's account of the events: On the morning of September 26, Gowen exited the cell block shower and noticed about 20 inmates standing in front of the correctional officers' podium. Gowen walked over to investigate and joined the group, which was requesting that the officer on duty allow the food tray slots to remain open. The officer requested that his supervisors come to respond to the inmates' request.

Correctional officers Captain William Enochs and Lieutenant Gerald Winfield arrived shortly thereafter. Enochs asked Gowen what the issue was, and Gowen replied that the inmates "just want[ed] [their] tray slots opened in order to get some air circulation." J.A. 253. Enochs immediately agreed, stating, "I have no problem with the slots being opened." J.A. 15. Gowen then told the other inmates that Enochs had granted their request to open the tray slots and encouraged them to return to their cells to lock down. The inmates did so, and the correctional officers then went from cell to cell to open the food tray slots. Gowen described helping the officers pop the tray slots open with his I.D. card. Gowen then returned to his cell.

4

A short time later, Winfield returned with a digital thermometer to check the temperature in K-Unit. Gowen asked Winfield what the temperature was in his cell, but Winfield refused to tell him. Winfield walked away while saying that the cell was "pretty warm." J.A. 263. Gowen then "encourage[d] other inmates to stand up for their rights [and] file complaints," suggesting that they "write . . . up [the officers] for keeping us in cells with no air circulating." Pl.'s Opp'n to Mot. to Dismiss Br. 5 (first quote); J.A. 264 (second quote); *see* Pl.'s Opp'n to Mot. to Dismiss Br. 7.

Just hours after the encounter regarding the thermometer reading, Winfield returned to K-Unit to inform Gowen that he was "under investigation . . . as 'a management problem.'" J.A. 15. Winfield said to Gowen, "[s]o you wanna be a ring leader, huh? We've got a place for ring leaders." J.A. 16. At that point, Gowen was moved to a short-term intake and classification area called "A-pod"—known to inmates as "the dungeon." The cells in A-pod had no outside windows, hot water, or access to hair clippers and shaving tools, and had constant overhead lighting.

Later that day, Officer Onesha Chambers served Gowen with a referral to LADC's Institutional Classification Committee (ICC). The referral stated that Winfield had asked the ICC to review Gowen "for the following reasons: management problem / pending investigation." J.A. 145. When Chambers served Gowen with the ICC referral, she stated that it was "just a notification of an investigation." J.A. 261. When Gowen asked why he was under investigation, Chambers responded, "I don't know[.] I guess this morning." J.A. 261. The referral stated only that a hearing would occur at some future undetermined date.

5

The referral provided Gowen an opportunity to identify three witnesses for the hearing and advised him that he was permitted to have an "inmate advisor" present at the hearing. Gowen listed his three desired witnesses: Enochs and two inmates who were present on the morning of September 26. Gowen also told Chambers that he wanted to have an inmate advisor present and inquired where on the referral he should indicate this. In response, Chambers told Gowen that he could request an inmate advisor "when [he] was served the actual hearing date" and that "this form was just to notify [Gowen] of [his] rights." J.A. 261. The referral indicated that Gowen was entitled to 24-hour notification of the ICC hearing, which Gowen elected not to waive. J.A. 145.

After receiving the referral, Gowen remained in A-pod for over a week. During this time, Gowen submitted an informal request and a grievance asking why he was under investigation and when his hearing would take place. He also requested the assistance of an inmate advisor. Gowen was then transferred from A-pod to the LADC's "Segregation Unit," where Gowen was held in solitary confinement. Gowen claims he submitted another informal request and another grievance restating his concerns while held in the Segregation Unit. Gowen never received a response to any of these grievances or informal requests.

After 34 days of solitary confinement in the Segregation Unit—without prior notice—Gowen was removed from the Segregation Unit and taken to an ICC hearing. In addition to receiving no notice of the hearing, Gowen was not provided the assistance of an inmate advisor to prepare for or advise him during the hearing. Additionally, two of the three witnesses Gowen had requested be present were unavailable at the time of the hearing. Enochs was away from the jail that day and one of Gowen's inmate witnesses was

6

in court proceedings, leaving Gowen with only one of his requested witnesses for the hearing, a fellow inmate.

Three LADC staff members presided over the hearing: Sergeant Phyllis Fouché, Corporal Todd Taylor, and Schneblagger. At the hearing, Gowen registered objections to the fact that two of his witnesses were not present, and that he had not been provided with an inmate advisor. He also objected that the hearing was not recorded or otherwise memorialized. In response to these objections, the ICC officers told Gowen that recording the hearing was "not necessary" because "there is no review," "[the ICC's] decision is final," and "there [is] no appeal." J.A. 18.

The ICC heard from Winfield and Gowen's sole witness and then issued its recommendation that Gowen remain in solitary confinement and that his confinement be again reviewed after 90 days. The ICC's written disposition contains no explanation for these recommendations, stating only that Gowen "is not clear by Administration [at] this time to return to gen[eral] pop[ulation]." J.A. 193.

Although Gowen immediately expressed his desire to appeal the ICC's decision, he was told that "there is no appeal." J.A. 26. Gowen filed a written inmate request form the following day reiterating his "verbal complaints from [the] hearing" and expressing yet again his request to appeal. J.A. 26–27. Nine days passed with no response. Gowen then filed a written grievance highlighting the same objections and, again, requesting an appeal. J.A. 26–27. Gowen never received a response, not to his inmate request form nor to his grievance.

Gowen's cell in solitary confinement measured 7 feet by 11 feet. During the 125 days Gowen was confined there, he was denied the ability to exercise or interact with others, in person or by telephone. After months of segregation without any meaningful human contact, Gowen began suffering from mental health problems, including depression, auditory and visual hallucinations, and paranoia. He was treated for these conditions with three psychotropic medications, including an anti-psychotic. He also gained 55 pounds (going from 180 pounds to 235 pounds), developed high blood pressure, and suffered from seizure-like dizzy spells and an eczema-like skin condition.

Gowen brought this lawsuit against prison officers Enochs, Winfield, Schneblagger, Fouché, and Taylor the officers involved in his detention and the ICC hearing (the Officers).

### B.     The Officers' Version of Events

The Officers describe some of the relevant events differently. They agree that on September 26, 2018, the inmates in K-Unit asked the officer in charge to open the food tray slots and that the officer lacked authority to approve the request. According to the Officers, though, the officer in charge agreed to ask his supervisor to approve the request only because Gowen and several other inmates refused to lock down. Enochs claims that Gowen "vocally encouraged other inmates to not lock down in their cells until management took steps to address his perceived needs related to the broken air conditioner." J.A. 125.

According to Winfield, Gowen "only locked down, and directed other inmates to lock down, once supervisors responded to K-Unit and . . . Enochs agreed to have the tray slots opened in the cells." J.A. 141. He "created unrest as he walked back to his cell by

8

loudly encouraging all inmates in K-Unit to file grievances against jail officers about the air conditioning issue," and violated jail policy by refusing to lock down and inciting a disturbance.[1] J.A. 141. In so doing, Gowen created a potential security issue and demonstrated that he wielded "significant influence over the other inmates." J.A. 126.

Following the encounter with the inmates in K-Unit, Enochs called a meeting with "a few key, experienced senior officers, including Lieutenant Winfield," to discuss the incident. J.A. 126. Those senior officers identified "Gowen and two other inmates" as "key agitators" during the incident. J.A. 126. Based on this identification, Enochs's own observations from the incident, and two prior reports of Gowen's misconduct from previous months, Enochs referred Gowen to the ICC as a management problem. Enochs ordered that Gowen be placed in solitary confinement pending the ICC investigation and hearing.

The Officers do not dispute that the only details provided on Gowen's ICC referral were "management problem / pending investigation." J.A. 145. The Officers dispute Gowen's contention that they failed to inform him of the reasons for his referral, however. Chambers claims that she "verbally informed Gowen why he was being referred to the ICC," that "he was referred to ICC as a management problem for his actions in K-Unit that morning, in response to the heat in the unit." J.A. 143. Chambers further claims that Gowen "did not ask for clarification on the reasons for his referral to ICC." J.A. 144.

---

[1] Notably, the Officers never submitted an incident report or any other LADC record detailing the purported disturbance.

The Officers agree that Gowen was not provided the assistance of an inmate advisor to prepare or advise him during the ICC hearing. According to Fouché, the ICC chair, Gowen "was informed prior to the hearing of his right to have a staff member present as hearing advisor" but he never requested such an advisor. J.A. 149. There is no dispute, however, that Gowen was not afforded 24-hour notice of the ICC hearing and was denied two of his three requested witnesses at the hearing. The Officers contend that the ICC hearing was scheduled to take place on the "first available date that worked for all required staff members" after the investigation was completed. J.A. 150. Fouché claims to have been unaware that two of Gowen's requested witnesses would be unavailable that day. Fouché states, however, that witness participation is not required by the ICC.

The Officers disagree somewhat with Gowen about what transpired at the ICC hearing. They agree that Winfield presented his version of the events that took place in K-Unit on September 26, 2018, and that the ICC heard the from Gowen's sole witnesses, a fellow inmate who was present for the events. The Officers claim Gowen did discuss the events of September 26. They assert that Gowen "presented his version of events" and did not simply raise procedural objections to the hearing. J.A. 149.

Finally, the Officers dispute that Gowen filed any grievances following the ICC hearing. They claim that he never sought to contest the ICC decision through the LADC grievance process. According to Enochs, Gowen submitted 72 inmate request forms and five grievances to jail staff between September 26, 2018, and April 27, 2020, but none related to the allegations in this lawsuit and all were documented and answered. The

10

Officers did not produce any of these inmate request forms or grievances in discovery, however.

### C.      LADC Grievance Process

The LADC employs a four-step inmate grievance process. First, the inmate must attempt to raise the issue orally with an officer. Second, the inmate must submit the complaint on an informal inmate request form. An LADC officer is required to respond to that inmate request form in writing. Third, the inmate must request and submit a formal grievance form. An LADC officer is once again required to provide a written response, but for these formal grievances the officer must do so within nine workdays. Fourth, the inmate must then appeal to the jail administrator by submitting the grievance form, the LADC officer's response to the grievance, and an appeal form.

### II. Procedural History

Gowen, proceeding *pro se*, filed suit under 42 U.S.C. § 1983 in the Western District of Virginia. Gowen alleges that the Officers violated his First Amendment right to be free from retaliation and his Fourteenth Amendment substantive and procedural due process rights.

The Officers moved to dismiss Gowen's claims. The district court denied the motion with respect to Gowen's Fourteenth Amendment claims, concluding that Gowen stated plausible substantive and procedural due process claims, and that the Officers were not entitled to qualified immunity on the pleadings. *Gowen v. Enochs*, No. 7:20-CV-00247,

11

2021 WL 960702, at *5–7 (W.D. Va. Mar. 15, 2021).[2] The district court dismissed Gowen's First Amendment retaliation claim. *Id.* at *8–10. In granting dismissal, the district court first determined that Gowen adequately pled facts sufficient to satisfy the first two elements of a First Amendment retaliation claim; that he had engaged in protected First Amendment activity, and that the Officers took an action that adversely affected his First Amendment rights. *Id.* at *8–9. On the third element of a First Amendment retaliation claim, however, the district court determined that Gowen failed to plead facts sufficient to show that his protected conduct was a substantial or motivating factor for his placement in solitary confinement. *Id.* at *9. The district court thus dismissed Gowen's claim of First Amendment retaliation against all the Officers. *Id.* at *10.

Following limited discovery, the Officers[3] moved for summary judgment on Gowen's Fourteenth Amendment due process claims. The Officers advanced three main arguments in support of their motion for summary judgment: 1) Gowen failed to exhaust his administrative remedies at LADC before filing his verified complaint; 2) the Officers did not violate Gowen's substantive or procedural due process rights; and 3) even if the Officers did violate Gowen's rights, qualified immunity precludes suit.

Gowen subsequently filed a 22-page handwritten memorandum that addressed all but one of the Officers' arguments for summary judgment—the argument that he failed to

---

[2] The district court dismissed Gowen's Fourteenth Amendment claims against Enochs, after finding that the allegations failed to state a claim against Enochs. Gowen does not appeal this ruling.

[3] Although Enochs had been dismissed from this case, we continue to use "the Officers" to describe the remaining Defendants-Appellees when analyzing the appeal from the grant of summary judgment.

exhaust available administrative remedies. Gowen did, however, address that point in his verified complaint. In responding to the Officers' motion for summary judgment, Gowen incorporated the verified complaint by reference into his memorandum in opposition.

The district court granted the Officers' motion for summary judgment because it determined that Gowen failed to exhaust his administrative remedies. *Gowen v. Winfield*, No. 7:20-CV-00247, 2022 WL 822172, at *2–4 (W.D. Va. Mar. 18, 2022). The district court concluded that "[a]lthough Gowen responded, in detail, to all the other declarations filed by [the Officers,] he did not respond to Maj. Enochs's declaration and did not address [the Officers'] exhaustion argument at all in his brief in opposition to summary judgment." *Id.* at *3. The district court thus assumed that Enochs's declaration was undisputed and that Gowen had conceded that he failed to exhaust his administrative remedies. *Id.* Despite recognizing that Gowen's verified complaint directly disputed Enochs's declaration, the district court dismissed the sworn statements in the verified complaint as "unsubstantiated and conclusory assertions." *Id.* at *4 (quoting *Pickens v. Lewis*, No. 1:15-cv-275-FDW, 2017 WL 3277121, at *4 (W.D.N.C. Aug. 1, 2017)). The district court did not reach the Officers' other arguments.

## III. Standard of Review

We review *de novo* a district court decision granting a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 268 (4th Cir. 2022). At the pleading stage, we evaluate whether the complaint states a plausible claim for relief. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). We

13

accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) ("*Martin I*"). Particularly "when an action implicates a civil rights interest," we "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Shaw v. Foreman*, 59 F.4th 121, 127 (4th Cir. 2023) (citation omitted). Furthermore, we must liberally construe complaints filed *pro se*. *Wall v. Rasnick*, 42 F.4th 214, 218 (4th Cir. 2022).

We also review *de novo* an order granting a motion for summary judgment. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 276 (4th Cir. 2024). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. (quoting Fed. R. Civ. P. 56(a)). "A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted).

## IV. Analysis

We analyze this appeal in three parts. First, we address the question of our jurisdiction to reach the motion to dismiss. Next, we analyze the district court's dismissal of Gowen's First Amendment retaliation claim. Finally, we review the district court's order granting summary judgment against Gowen on his Fourteenth Amendment claim.

A.  Appellate Jurisdiction

The district court entered two prior orders rejecting Gowen's claims: an order dismissing Gowen's First Amendment claims and Enochs, and an order granting the remaining Officers' motion for summary judgment on the Fourteenth Amendment claim. Because it was not a final order, Gowen had no right to appeal the motion to dismiss until the order granting summary judgment resolved his remaining claim. *See Britt v. DeJoy*, 45 F.4th 790, 793 (4th Cir. 2022) (en banc).

On appeal, Gowen's *pro se* opening brief requested review of the entire record, including both the summary judgment and dismissal orders. Gowen's subsequent briefs, filed on his behalf by court-appointed counsel, also requested review of the entire record. In his notice of appeal, however, Gowen expressed only an intent to challenge the summary judgment order, not the earlier order on the motion to dismiss. The Officers argue that the motion to dismiss is not properly before us because, they claim, Gowen failed to comply with Federal Rule of Appellate Procedure 3 by not expressly challenging the dismissal order. Our recent precedent, *Jenkins v. Woodard*, 109 F.4th 242 (4th Cir. 2024), forecloses the Officers' argument.

In *Jenkins*, this court explained that a notice of appeal need only state who is appealing, the order or judgment being appealed, and to what court the appeal is being taken. 109 F.4th at 246 (citing Fed. R. App. P. 3 Advisory Committee's Note to 2021 Amendment). Rule 3 was amended in 2021 to adopt the "general merger rule," "under which a party's identification of the final judgment in its notice of appeal confers appellate jurisdiction over prior interlocutory orders that merge into the final judgment." *Id.*

15

Accordingly, "a party need not designate all orders he seeks to appeal in his notice of appeal." *Id.* (citing Fed. R. App. P. 3(c)(4)). "Rather, a party's notice of appeal of a final order encompasses all orders that merge into that order." *Id.* Though the *pro se* appellant in *Jenkins* expressly appealed only a summary judgment order, "that order encompassed all prior district court orders," including the district court's orders denying appointment of counsel and additional time for discovery. *Id.* at 247.

Gowen's notice of appeal similarly stated that he received the district court's "memorandum of opinion . . . granting defendants' motion for summary judgment" and that he intended to challenge "this decision." J.A. 342. As *Jenkins* instructs, "an appeal from a final judgment permits review of all rulings that led up to the judgment." 109 F.4th at 247 (quoting Fed. R. App. P. 3 Advisory Committee's Note to 2021 Amendment). Because Gowen adequately complied with Rule 3, we possess appellate jurisdiction to review the district court's order granting the Officers' motion to dismiss.

## B.  Gowen's First Amendment Claim

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. Accordingly, the First Amendment prohibits public officials from retaliating against individuals for having engaged in protected speech. *See Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017). To state a First Amendment retaliation claim, a plaintiff "must allege that: (1) he engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected his First Amendment rights; and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) ("*Martin II*") (alterations omitted).

16

Gowen alleged two First Amendment claims. First, he claimed the right of incarcerated people to be free from retaliation for utilizing the jail's grievance process. *See Booker*, 855 F.3d at 530–41. The district court correctly recognized this right. *Gowen v. Enochs*, 2021 WL 960702, at *8–9. Second, he claimed the right to be free from retaliation for peaceably encouraging other incarcerated people to submit grievances about the conditions of confinement. *See Lamar v. Payne*, 111 F.4th 902, 908 (8th Cir. 2024) (holding that peaceably encouraging other incarcerated people to raise grievances is protected speech where the speech itself poses no security concern).[4]

The adverse action here is plain. Gowen alleges that the Officers placed him in solitary confinement. Any action taken by a public official that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights" is properly considered retaliation. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Placement in solitary confinement isolation is an adverse action. *See Martin II*, 977 F.3d at 305.

In order to plead a First Amendment retaliation claim, a plaintiff must plausibly allege a causal connection between First Amendment activity and an adverse action. *Martin I*, 858 F.3d at 249–50. This causation element requires that a plaintiff plausibly allege that

---

[4] The district court misapprehended the second right asserted by Gowen. *See Gowen v. Enochs*, 2021 WL 960702, at *9. Gowen asserted the right to peaceably encourage others to submit grievances. He did not assert a right to *assist* other inmates in writing grievances or legal documents, nor does he allege that he offered such assistance. The cases cited by the district court, *Tighe v. Wall*, 100 F.3d 41 (5th Cir. 1996) and *Neal v. Stouffer*, No. CIV.A. PJM-12-524, 2013 WL 693036 (D. Md. Feb. 25, 2013), address and reject assertions of this latter right, but do not address the right asserted by Gowen.

17

"the defendants were aware of [the plaintiff's] engaging in a protected activity" and show "some degree of temporal proximity to suggest a causal connection." *Shaw*, 59 F.4th at 130–31.

Despite the prescribed lenience we must afford to *pro se* plaintiffs, *see Wall*, 42 F.4th at 218, the district court concluded that Gowen did not meet his burden to plead the causation element. The district court held that Gowen "fail[ed] to allege that any of the defendants knew he had filed any grievances" and "offered no facts to connect the filing of his grievances to any of the actions taken against him." *Gowen v. Enochs*, 2021 WL 960702, at *9. The district court also stated that temporal proximity alone cannot satisfy the causation element of a First Amendment retaliation claim. *Id.* The district court, however, failed to take full account of Gowen's allegations.

Gowen alleges that *just hours* after he orally complained about the heat in his cell and encouraged other inmates to utilize the grievance process to do the same, the Officers moved him to A-Pod and referred him to the ICC. A week later, Gowen was placed in solitary confinement. The first step in the LADC grievance process requires an inmate to "make an effort to verbally resolve the situation with the officer assigned to the housing unit." J.A. 244. Gowen thus commenced the LADC's grievance process when he complained to Enochs and Winfield about the hot and humid conditions in his cell. Utilizing the jail's grievance process is First Amendment protected activity. *See Martin I*, 858 F.3d at 250 ("The First Amendment protects the right to petition the Government for a redress of grievances, and the Supreme Court has recognized that prisoners retain this

18

constitutional right while they are incarcerated.") (internal citations omitted); *Booker*, 855 F.3d at 530–41.

The district court ruled that Gowen failed to connect adequately the "*filing* of grievances" with the adverse actions taken against him. *Gowen v. Enochs*, 2021 WL 960702, at *9 (emphasis added). To the extent that the district court limited First Amendment protection to formal grievances, the LADC's third step in the grievance process, that was error. Indeed, this would mean public officials could retaliate freely against inmates engaging in protected free speech as long as the officials did so promptly, and inmates could be subject to retaliation as long as they were only at the stage of lodging informal grievances. Such a rule would not comport with the requirements of the First Amendment and must be rejected.

Gowen also plausibly alleges that at the time the Officers removed him from K-Unit, the Officers knew Gowen grieved the conditions in his cell, encouraged other inmates to do the same, and then later knew of Gowen's grievances regarding the alleged lack of process. Gowen alleges that he complained about the conditions to Enochs and Winfield directly. He alleges that he complained about the ICC process and his placement in solitary confinement to both Chambers and the ICC officers. He also alleges that he submitted informal inmate requests and grievances that presumptively would have been read by the Officers, particularly because Enochs is the jail administrator for the LADC.

We conclude that Gowen plausibly alleges the causation element of his First Amendment claim. At the pleading stage, alleging temporal proximity between protected First Amendment activity and a retaliatory act satisfies the causation element when the

official is aware of the First Amendment activity. *Martin I*, 858 F.3d at 250 Gowen alleges that the reprisal came swiftly after he commenced the informal grievance process. Gowen also alleges that when Winfield removed Gowen from his cell to take him to A-Pod, Winfield said to Gowen "[s]o you wanna be a ring leader, huh? We've got a place for ring leaders." J.A. 16. This statement supports a reasonable inference that the Officers removed Gowen from the general population in retaliation for his grieving the conditions in his cell and encouraging other inmates to do the same.

Having determined that Gowen adequately alleges that he engaged in protected First Amendment activity, was subject to an adverse action, and that there was a causal relationship between the two, we hold that Gowen adequately pleads the necessary elements of a claim of First Amendment retaliation. Dismissal was therefore improper.

## C. Gowen's Fourteenth Amendment Claim

Pretrial detainees have a well-settled constitutional right under the Fourteenth Amendment to be "free from punishment." *Williamson v. Stirling*, 912 F.3d 154, 173 (4th Cir. 2018) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). That right derives from the Due Process Clause, which protects such detainees from punishment "prior to an adjudication of guilt in accordance with due process of law." *Id.* (quoting *Bell,* 441 U.S. at 535). This settled principle applies "to substantive and procedural due process claims pursued by pretrial detainees." *Id.* at 174 (collecting cases). Segregation of a pretrial detainee, intended as a penalty for disciplinary infractions, constitutes punishment such that it implicates a protected liberty interest under the Fourteenth Amendment and may not be imposed without due process. *Dilworth v. Adams*, 841 F.3d 246, 253 (4th Cir. 2016).

20

Gowen was a pretrial detainee at all relevant times. He asserts that the Officers violated both his substantive and procedural due process rights by placing him in solitary confinement in retaliation for using the LADC's grievance process—in other words, by punishing him without proper cause or procedure. When considering whether Gowen was punished in contravention of the Due Process Clause, we accept the evidence in the light most favorable to him. *See Williamson*, 912 F.3d at 178.

The district court granted the Officers' motion for summary judgment after determining that Gowen had failed to first exhaust his available administrative remedies. *Gowen v. Winfield*, 2022 WL 822172, at *2–4. The Prison Litigation Reform Act provides that an inmate's lawsuit may be defeated for failing to fully exhaust all available administrative remedies. *See* 42 U.S.C. § 1997e(a). If an administrative remedy proves "unavailable" to an inmate, however, he need not exhaust that remedy before bringing suit. *Ross v. Blake*, 578 U.S. 632, 642 (2016). Before we can reach the substance of the administrative exhaustion issue, we must first address the district court's conclusion that Gowen forfeited any argument that he exhausted his administrative remedies.

### i.    Forfeiture

In support of the Officers' motion for summary judgment, the Officers submitted a declaration from Enochs stating that "Gowen did not submit any request form or grievance regarding the allegations underlying this lawsuit." J.A. 241. The district court determined

21

that Gowen failed to respond to this argument, and therefore it was forfeited. *Gowen v. Winfield*, 2022 WL 822172, at \*2–3. That conclusion was incorrect.

In his verified complaint, Gowen made sworn assertions pertaining to his exhaustion of available administrative remedies. Gowen claimed that he sent multiple informal requests and grievances regarding his placement in solitary confinement and that the Officers told him he could not appeal the ICC decision. That is sufficient. A verified complaint "based on personal knowledge" must be treated as "the equivalent of an opposing affidavit for summary judgment purposes." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (quoting *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)); *see also World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 516 (4th Cir. 2015) (explaining that a "verified complaint" containing "sworn statements" based on "personal knowledge" is akin to an "opposing affidavit for summary judgment purposes" (quoting *Williams*, 952 F.2d at 823)). Affidavits and verified complaints may not be cast aside at summary judgment, "even affidavits that are uncorroborated, self-serving, or filed by *pro se* prisoners." *Alexander v. Connor*, 105 F.4th 174, 183 (4th Cir. 2024). At this stage, we must not "weigh evidence and draw inferences from the facts" in an effort to "figure out whose version of events is more likely to be true." *Id.* at 179.

Because Gowen preemptively addressed the issue of administrative exhaustion in his verified complaint, he did not have to do so again by submitting an affidavit in response to the Officers' motion for summary judgment. *See Davis v. Zahradnick*, 600 F.2d 458, 459–60 (4th Cir. 1979) (vacating entry of summary judgment because even though plaintiff "did not respond" to defendants' affidavits, the "factual allegations of the verified

22

complaint . . . precluded summary judgment"). Gowen thus did not forfeit his arguments pertaining to administrative exhaustion.

### ii.      Exhaustion of Available Remedies

We next consider whether Gowen submitted sufficient evidence to preclude summary judgment in favor of the Officers. Of course, if an administrative remedy proves "unavailable" to an inmate, he is considered to have satisfied the exhaustion requirement. *Ross*, 578 U.S. at 642. An administrative remedy is considered unavailable "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). This includes instances where: 1) the administrative procedure is "a simple dead end"—in other words, the prison officials are "unable or consistently unwilling to provide any relief"; 2) the process is "so opaque" that it becomes practically "incapable of use" such that "no ordinary prisoner can discern or navigate it"; or 3) the prison "thwart[s] inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643–44. Failure to exhaust is an affirmative defense for which the Officers bear the burden of proof. *See Jones v. Bock*, 549 U.S. 199, 216 (2007).

In his verified complaint, Gowen describes his multiple attempts to utilize the LADC's administrative grievance process. With respect to the ICC decision, he presented sufficient evidence to conclude that LADC's grievance process was unavailable to him. Both during the ICC hearing and after the disposition requiring him to remain in solitary confinement, Gowen alleges that the ICC officers told him that the ICC decision was "final" and that he *could not* appeal. J.A. 18, 26 ("After the hearing & disposition[,] I

23

verbally expressed my desires to appeal [and] was told there is no appeal."). Indeed, the record before us contains no evidence that an inmate has the right to appeal an ICC decision. The only evidence before us is the LADC grievance policy, which specifically states that grievances are not permitted in response to "[d]isciplinary hearings." J.A. 244. Presumably, this prohibition applies to Gowen's ICC proceeding because the Officers contend that the ICC hearing stemmed from Gowen "violat[ing] jail policy." J.A. 106.

If Gowen possessed no right to appeal the ICC decision, then the administrative exhaustion requirement could not apply to his claims. It is axiomatic that if there was no remedy available, there was no remedy for Gowen to exhaust. *Ross*, 578 U.S. at 642 (holding that while an inmate "must exhaust available remedies," they "need not exhaust unavailable ones."). Even if inmates *could* grieve an ICC decision—which the record before us does not reflect—the fact that the Officers told Gowen that he could not appeal the ICC decision would still amount to thwarting Gowen from using the grievance process through "machination" and "misrepresentation." *Id.* at 644.

Gowen's sworn statements present facts that he exhausted all available administrative remedies before the ICC decision. Immediately after he was moved to A-Pod, Gowen complained orally about having been removed from the general population. Gowen then submitted several informal inmate request forms. Despite receiving no response to these requests, Gowen filed formal grievances reiterating the same complaints. Again, he received no response. Evidence of these acts preclude a claim that Gowen did not exhaust the first three steps of the LADC administrative grievance process.

24

The fourth step of the LADC administrative grievance process required that an inmate, after receiving a written response to a grievance, appeal to the jail administrator. Gowen's sworn statements establish that the Officers prevented Gowen from completing this final step. Under the LADC grievance process, Gowen could not file an appeal to the jail administrator without first receiving a response to his earlier grievances. LADC thus, by failing to respond to Gowen's grievances, rendered the final step unavailable to him. As a result, the fourth step in the LADC grievance process was not an "available remedy" to Gowen. *See Moore*, 517 F.3d at 725 (stating that "a prisoner has exhausted his available remedies, even if prison employees do not respond."). We conclude that Gowen presented sufficient evidence to preclude summary judgment in favor of the Officers on the exhaustion issue.

Accordingly, we vacate the summary judgment order and remand for further proceedings on Gowen's Fourteenth Amendment claim.

## V. Conclusion

We conclude that Gowen adequately pleads a First Amendment retaliation claim and presented sufficient evidence to preclude summary judgment based on exhaustion of his Fourteenth Amendment claim. Accordingly, we reverse dismissal of Gowen's First Amendment retaliation claim and vacate the district court's grant of summary judgment. We remand for further proceedings in accordance with this opinion.

*REVERSED IN PART, VACATED IN PART, AND REMANDED*

25